mispronounced the name. It's been a while since I've had back to back. All right. Good morning. Please the court. Yes, ma'am. You've got the podium. My name is Gay Gilson, and I represent the appellate Armando Ibanez in this case. This is a Title VII case, and it's brought alleging intentional indiscrimination under national origin and race discrimination. The trial court granted summary judgment, finding that there was not sufficient evidence for a jury to find intentional discrimination. And I believe that the trial court made that decision in error based on three primary issues. Number one, Mr. Ibanez was qualified for his position for promotion and for tenure. The trial court relied upon the representations of the defendant that Mr. Ibanez did not meet the qualifications because he did not have two or more juried or activities. And however, the trial court did not go through any sort of evaluation or any sort of explanation of how it determined what is a juried activity. And in this case, A&M has these policies set out. And in those policies, they define or they use the term juried to mean various . . . Let's see here. A juried activity can be . . . So you're arguing that because there's no specifics in there as to what is juried and what isn't, that whatever your client may have done academically, et cetera, necessarily fits? Is being juried or what? Well, A&M provided a checklist of what is juried. And forgive me, I'm trying to find that. There are three things that, in particular on a form for the promotion and tenure, that they include as part of that definition. And it includes exhibits, performances, or competitions. So in the response to summary judgment, Mr. Ibanez provided his credentials, which included more than two of those items, exhibits, performances, or competitions. Now, Texas A&M did not include in the record that definition, but it is published online as part of their credentials that is available and widespread throughout the community. This court has acknowledged in prior cases that if there is information that is published by a governmental entity, such as the state of Texas, that it can take judicial notice of that. And so I believe that those additional definitions are before the court. What specifically . . . I mean, he's on a tenure track, you know, for juried contributions.  So stripped to the essentials, what are you saying on behalf of your client were the requisite juried pieces that he had that the district court missed or otherwise isn't there? I mean, what is it? Well, Your Honor, they are identified specifically in the brief, but a summary of them is that he provided . . . Did he designate . . . I mean, okay. His deposition was taken, right? Yes. All right. In that deposition, does he iterate my juried items were one, two, three, four, five? I do not believe that it was identified in that manner, Your Honor. But in the response to the motion for summary judgment, there is an affidavit declaration by Mr. Banyas. All right. Let me ask it another way, not cutting you off. It's here on summary judgment, right? Yes. All right. So you're arguing that the trial court erred by granting summary judgment to Texas A&M, right? Yes. All right. Which is to say either the grant of summary judgment was erred as a matter of law or that there were genuine issues of material fact, right? Yes. All right. So you're arguing that there were genuine issues of material fact, that the district court got wrong, didn't assess, construed the evidence and the like most favorable to Texas A&M, I mean, which . . . I read your briefs and I got it, but I'm trying to zero in on where the error is that you're . . . and I'm not suggesting there isn't. I'm just trying to zero in or you're arguing that as a matter of law, they're not entitled to because of the statute or are you convinced that there's some facts here that didn't get weighted out? Your Honor, there were facts that were not weighted. Regarding the . . . when you look at the plain reading of the meaning of juried, it's not . . . the trial court focused on the idea that there was only one, I guess, juried, they used the term juried, film that was submitted by Father Ibanez. But that wasn't . . . that's not what A&M standards are. A&M standards are . . . But I'm saying he . . . his deposition was taken and in the deposition, even he doesn't say, here's what my juried ones were. Does he? I mean, you know that he didn't. But, Your Honor, I don't think it was required to put it in a deposition. Well, if it's his deposition and he's making the claim, why isn't he the best person to know what he considered his juried items, you know, were to iterate in his deposition, which is part of the summary judgment record? It is in the sense that, yes, it was submitted. And, yes, there was testimony about his credentials. And I think that there may be a distinguishment between what I'm hearing and responding as to what you're saying. No, all I'm saying, I'm not trying to ask a trick question and I haven't prejudged the case. I'm just noting it's here on summary judgment, right? Yes, Your Honor. All right, so to get us to reverse the trial court, you've either got to convince us that they're not entitled to summary judgment as a matter of law, messed the statute up or whatever, or that there's facts that need to go to a jury or need to be parsed out greater. And I'm just trying to hone in. We read the briefs, but I'm trying to hone in. Where's the fact, dispute or pieces the district court missed? Is there something there that, you know, that we're missing? I read it and we see here what jury it is, but I'm trying to cut to the chase exactly what you're saying the fact there is. What are the disputed facts? The disputed facts are whether or not the other films, the poems, the other items that Father Abani has submitted as part of his package for promotion and tenure, which is part of the record, the trial court's record, and it is also part of Father Abani's or excuse me, Mr. Abani's affidavit that was before the trial court explaining his credentials and why he should have been selected for tenure. Let me, can I ask the same question a different way? Okay. Looking at his deposition, looking at the application for tenure, looking at all of the various faculty members that voted that he should get tenure, what single other work was most juried? What would you point to that's like men of steel? Instead of you've got a list in the reply brief, you've got a summation, what single work was the most selective, competitively selective? I think that the, the way that I understand that the court. I'm just asking you what other work is the one that you would say was juried? Most obviously. There may have been many, like a poll. Okay. One was a presentation at the University of, forgive me, I thought I had this. He had made two presentations. He was invited to present at two universities. Okay. So it's two presentations. Yes. And in the, in the record given to the district court, was there any evidence that that was selective, that was competitive? I don't believe that it described it in that manner. Why isn't that a bit of a problem? And then it's a two-part question. In his exhibit A1, the attachment to the application, he does put parentheses juried only by men of steel. Why would be the, why would the district court be mistaken to rely on his own characterization of only one item as juried? Or is that too formalistic? Because the, the textual meaning, the plain meaning of juried does not mean that it has to literally be voted on or in a competition. And when we look at what A&M published regarding the tenure track and what you must consider as part of that juried and what that definition is, no one ever looked at that. I mean, I get that, but I still come back to, you know, he's the best arbiter of his situation. If he's not self-denominating something other than men of steel as a juried item, then how can you make the argument that, well, not how, but I mean, if he said, for example, one, two, three, four, these were juried, the district court disregarded that, yeah, yeah, yeah, then I might be open to the argument. Okay. The district court did not construe the evidence and the like most favorable to the non-moving. Therefore, King's X, go back down and do it over. Okay. And that, but I just don't hear that argument. You're saying there were other things, but you're not pointing to that. Even your client identified something beyond men of steel to be a juried item, but you're saying the district court missed it by not construing these other matters. Do you understand the thrust of the question? In addition to what Mr. Bonias presented, there was evidence also from Laura Vasquez, an expert, and I think one of the unique problems in this situation is Texas A&M University at Kingsville, it doesn't, Mr. Bonias is kind of alone in what he did. And so when there was a review of his academic record, he didn't have people who were well-versed in this or understood. And so Laura Vasquez, one of the experts, um, pointed out that his record was not properly, and this was before the trial court and an affidavit, um, her opinion was not properly before the court. Um, also there was a testimony in the form of a, an affidavit from Santa Barraza, who was the former chair, and she was a member of that department up to 2020. And she provided three examples of how white males. Okay. So now you're assuming, and I know your time's precious, that if we agree with you, there's an issue of fact as to his being qualified. Now you're jumping to say there was also an issue of fact as to animus and that you're going to point to Dr. Barraza. Well, yes, but also, um, Dr. Barraza, that is some, and it talks about institutional as well. We pointed out, and I obviously you've read the briefs, but there were numerous things, and I think one of the things that jumps out, and it goes back to the credentials, is that there was a finding by the, um, preliminary advisory committee that, uh, Mr. Bonias, he made a prima facie case that the decision to deny him tenure was made in violation of his academic freedom for an illegal reason or without adequate consideration of his record of professional achievement. So this was a finding by that university committee. What happened with that? So it was raised in the brief and the, um, appellee responded, but the way that it was responded was, well, he had more appeal rights, but that's a pretty concerning finding from a university committee. So if they're finding that his record was not properly considered, that's a big problem in this case, because that's what the issue is. We're trying to say, hey, look, he was qualified and they didn't properly consider the record. There was also issues. When they said that, did they specify a second item like men of steel? No, they did not. It was just a finding, but there was more than one. And the best evidence of discriminatory intent, instead of maybe just mix up as to what the guidelines getting tenure specify, in other words, what's your motive, what jumps out at you here that shows discriminatory intent as the real reason? To me, it's the fact that they didn't follow policy. And part of the support of that is this finding from this committee, because if you're not looking at a record, if the, um, if there is discrimination, illegal discrimination, that is part of the basis of the decision that is from the university itself. It's not like I made that determination. It's part of the university process. And as we know, under title seven, when there's evidence or information where there is discrimination, it's incumbent upon the employer to take prompt and I'm asking for the best evidence of discrimination based on race and national origin. It may be everyone's confused about what the qualifications are. In this particular case, um, there were recommendations. Father Vanius was recommended by the final committee to the president, uh, for promotion and tenure. And there were two white males also with the same recommendation. Father Vanius was not promoted. Um, he was that Farity and Ransom. I believe so, but we didn't know what department they were in. And, and that could be a problem because in other departments you can get tenure based on referee publications. So I think there was a third comparator that was specified to be in the film. So, and so I, my, my, I would think we would have to focus on that one, right? If we don't even know what department those two were in. That is part of the evidence. Um, there is evidence that, um, he's, um, he is part of a protected class. Um, the, the trial court also gave deference to people, uh, that were not, um, primarily within his area of, um, his area within radio, television, and communication. So like the provost and those, the three levels above him that considered this, they are academics. They're not. All right. One last question. The, what is the summary judgment record consists of? The summary judgment, uh, judgment record consists of, um, an affidavit by, uh, Mr. Vanius, which substantiates what he submitted in his credentials. Um, there is an affidavit, um, from the expert, um, Laura, um, Vasquez, which explains the standards in this particular issue or this area. And then there was also an affidavit from Santa Barraza, um, who was a former chair of this department who provided evidence of disparate treatment. Um, and honestly, that's what I was deposition, right? Well, part of his deposition was in the record. I don't believe his entire deposition was submitted into the record. I was not the trial court counsel, but I should know that, but . . . Yeah. I mean, if you're up on summary judgment, it doesn't matter who represented him, you need to know what's in the record, uh, because that's what it's, what it's, that's why I'm trying to, in my mind, get my head around exactly what's in the record. If you're asking us to reverse to district court, my question was going to be, is there evidence that's not in the summary judgment evidence that would need to be in the summary judgment for record, uh, for the district court to properly consider the claim, or is it your view, everything is in there, it's just a matter of how it was considered? The, from my recollection, the entire deposition was not submitted. However, to me, his affidavit, Mr. Bonyas' affidavit covers the issues that needed to be covered and provided that information. So you would say the record is complete in that sense? Yes. Okay. All right. That's all. Just trying to be clear. All right. Thank you. You've reserved your rebuttal time. All right. Mr. Walton. May it please the court. My name is Ben Walton and I represent the Appalee, Texas A&M University, Kingsville, or TAMUK for short. There are two independent reasons why this court should affirm the judgment of the district court, granting the summary judgment on the Title VII race discrimination claim. The first sufficient reason for affirmance is that Ibanez did not produce evidence to the district court showing what second creative work he had completed that was juried under any definition of the term juried. The second alternative reason that requires affirmance is that Ibanez did not present evidence showing how the specific people who looked at his tenure application and voted against it did so because of his race. So for either of those two reasons, this court can and should affirm the judgment below. Why on the first, why isn't it a sufficient issue of fact if quite a few members of his faculty did say and voted for him saying he was qualified and then an expert, at least one of them said his work was qualified? Why doesn't that create an issue of fact, as opposed to them splicing down to what's juried and what's not? It's because none of those other minority of individuals at the various levels of review who said, we think he should, none of them ever were able to identify a second creative work that was juried. They did say he was qualified for tenure. In their opinion overall, yes, Your Honor. They said, we believe he should be granted tenure. Do you presumably know what the standards are or you don't think that that presumption can be made? Presumably they knew what the standards were, however, implicit finding that he had sufficient number two juried works. The two other presentations presume, you know, you get invited to give a presentation to the university. It's probably selective. They picked you. No, Your Honor, that inference is not reasonable because, uh, Ibanez's position throughout litigation was similar to the position he took at the appeals throughout the, uh, the university, which is I am a filmmaker. Therefore, I should not be required to submit multiple juried works because that's not how filmmakers operate in the industry. He made that pitch over and over again to his college dean. The dean rejected it and said, no, you're bound by the same standards that the other faculty members are bound by. You have to have two juried works. Then in litigation, he retained an expert, Vazquez, and Vazquez summarized her own opinion as an expert being that the university should adopt the uniform video film associations guidelines, which do not require juried works for filmmakers to achieve tenure at academic universities. So again, you're, you're, he never says in his deposition or affidavit or these dissenting faculty peers, no one ever specifies a second juried work. That's correct, Your Honor. There seems to be disagreement over whether Ibanez should have been required to identify such a second work. But that does, that is not a title seven question. That is a question of how Tim Uch wants to impose requirements on a filmmaking professor, whether they want to create special exceptions or not. Some people on the various committees thought they should, but the department chair, the college dean, the whole, the college committee, as well as the provost and one of the two split appeals committees and the president who decided all made their decision based on the criteria in place at Tim Uch, and they decided not to make a special exception for filmmakers. Is there any, is there any history in this university of exceptions that were granted? Uh, not in the record, Your Honor, and not to my knowledge either. Uh, in fact, the only evidence is that all of these levels of review, these administrators were looking through the tenure application and because they saw one juried film and they saw a lot of other creative activities, but no indication that they were also juried. They simply wrote the recommendation. He doesn't meet the requirements. Absolutely. Your Honor, these requirements have been in place, uh, since, uh, 2014 when he first signed his contract and was given, here are your five tenure track years. And this is what's required for tenure. And as he testified, uh, and alleged, he went to his dean multiple times through those five years and said, this isn't fair. I shouldn't have to do juried stuff. That's not what filmmakers do. I thought when you say there's nothing in the record, I thought he did offer Dr. Barraza saying as the former chairman, I know at least three people were given accommodations. Oh, I'm sorry. I misunderstood. So Professor Barraza identified, uh, or attempted to identify three other individuals that, um, had received tenure. And it was Professor Barraza's assertion that they had failed to meet some sort of requirement, but devoid in the record is any evidence showing whether they did or didn't. So nobody knows what department those other professors were in, what year they went up for tenure. I thought as to Lucas, Lucas was in the film. That that's correct. Your honor. Yes, your honor. I, it was the, the two, I believe, uh, judge Higginson named them earlier. Let's focus on just the one in the humanities and then the film department. Of course. Is there a suggestion that an accommodation was made for him? Didn't have to get two juried words. I do not believe that is clear from the record. What is clear as to what applied to Professor Lucas is that he actually went up for tenure consideration in 2005. That was almost 15 years before Professor Abana's was up. There's no indication as to what the requirements of the department and the college were at that point, whether they'd been revised in those 15 years span. There's certainly no indication that the people who reviewed Professor Lucas's application were the same people, or even a substantial overlap of the people who reviewed Professor Abana's his application and certainly different administrators in different decades in an institution have the discretion to treat people differently during their, their administrative tenure. The question here is whether there is evidence that the same people looked at an application packet from one professor and from a second professor. They both had either the same qualifications or the same failure to meet qualifications, and yet they granted tenure to a white applicant and denied a minority applicant tenure. There's no evidence of that on this record. That is what I was saying in response to Judge King. There isn't any evidence in that situation in the record of one getting it and one not, right? Is that what you're saying? Uh, there, yes, Your Honor, I believe. There is only evidence that there were certain professors who got tenure from other departments in years that presumably may have been close to the year that Professor Abana's was denied tenure. There's no evidence to show that those other professors were similarly situated to Professor Abana's. For example, the appeals process after having a negative recommendation from his department chair, from the college committee, from the college dean and the provost, uh, the appeals process is oddly a bifurcated appeal. So one committee considers it and another committee considers it. And then it goes finally to the president for decision. Abana's appeals committees were split. One committee recommended him. The other committee did not recommend him. And then the president was put in a position of having to side with one committee's recommendation and disagree with the other committee's recommendation. But there's no evidence that those other two professors had split recommendations from their appeals committees. Perhaps the appeals, both appeals committees recommended that they be promoted and tenured, in which case they're not similarly situated. That's just one example of many of where there's not enough evidence here on this record to say whether they were in a similar position or not. And the district court properly analyzed all of that and correctly determined these are not similarly situated comparators. In fact, Abana's on page 296 of the record when he was asked during his position, because he had made allegations about systemic racism within the university. And when he was asked more specifically, well, but what about President Hussey, who made this final decision on your tenure application? Do you believe that he made that decision because of your race? And Abana's pulled back. He said, I don't know. I'm simply talking about their systemic racism in this university. And that's why I should have gotten tenure. Abana's has not alleged, let alone put forward evidence to say that either the president or his college dean, who is Hispanic, or his department chair or anybody on the college committee or the academic provost or the promotion appeals committees, all of whom recommended against his tenure, that any one of them, let alone a majority of them, were making that decision because he is Hispanic. There's no evidence. There wasn't even an allegation of such an attempt to put forth. Were any of those person's depositions taken, the president, any of the? Yes, your honor. The depositions that were taken in this case included the deposition of the president, President Hussey, the deposition of the provost, Alan Rasmussen, the deposition of the department chair, Todd Lucas, and the deposition of Dean Dolores Guerrero, the college dean. And Abana's had an opportunity to depose all of those individuals. The advisory committee that voted 3-2 and stated there was an illegal reason. Did they specify what illegal reason? No, your honor. And they didn't even say that there was an illegal reason. So there were three things that that, that that preliminary advisory committee. Abana's established a premier fashion case, provost decision was made in violation of the faculty academic freedom for an illegal reason. Oh, I see. Or. Or. Yes, your honor. So we don't know whether the advisory committee believed that it was a violation of his academic freedom or whether it was an illegal reason or whether it was simply a failure to properly judge the merit of his scholarship. All of those are three reasons. And the function of the advisory committee to, to address what my colleague on the other side said was to allow an appeal to move forward or to simply kill it. So the advisory committee looks at the face of an appeal and if it's going to be a waste of time because it doesn't even fit either of those three categories, then it says we deny the appeal. It doesn't even need to go for consideration by those split appeals committees. The advisory committee did not kill the appeal here. It said, here's, here's the prima facie check box, right? Now it goes to a full consideration by the merits, by the actual appeals committees who actually look at the evidence and make findings. Well, may the promotions committee and the tenure committee work simultaneously or is one before the other? They're simultaneously, Your Honor. And they came to opposite conclusions. Yes, Your Honor. They did. Um, going back to the issue of whether Ibanez did provide evidence of his qualifications. This court can easily take judicial notice of the dictionary definition of the word juried. It refers to something that goes through a selection process where there's some sort of competitive submission review and acceptance. He knew what that process was, which is why he argued it shouldn't apply to him. He also knew what it was because he had done it before with the men of steel. He had that film, that creative work juried and it won many awards internationally. And yet he still was not able to point the district court or TAMUK or counsel or, or even this court in the record to a specific second film, screenplay, poetry, all of his different categories of creative activities. He hasn't been able to identify one that was actually submitted to a competitive screening process, competitive art exhibition, some sort of curated event where you make your submission, it's reviewed, and then it's accepted. Maybe his other films wouldn't have won quite as many awards, but he didn't even try. The first film he submitted, men of steel, was juried during his first of the five tenure track years. He had four more years to take any of these works and simply submit it to another festival. Maybe it wasn't as prestigious of a festival. Maybe it would have narrowed it down to two university presentations. Yes, Your Honor. And there's no evidence to show whether that was, he had friends at the university who wanted to watch it and he arranged for a screening or whether it was some sort of competitive process. And that is why the district court was correct by saying, I've got all of your best evidence in front of me as to why you think you had a second creative work. And I can't tell whether any of these were actually submitted through the juried competitive process. That burden of proof is on Ibanez. Here's one of the differences in this case. If he had come in and said, there was a film department at another university and they looked at my film and they looked at it and judged it and said, we want to do a special showing of this film on campus for our film students. Then there might be a fact issue as to whether that process counts as juried. But he didn't even do that. He simply said, here's my resume. Here's all the works I've done. Next to this one, I'm going to put juried and list the film festivals and awards. Next to anything else, nothing. So he knew what juried meant. He argued that it should not apply to him. He retained an expert to apply before the district court that it was unfair. Those are the expert's words, unfair to apply the multiple juried works requirement to a filmmaker, but he still wasn't able to point the court to in the alternative, here's the second work and here's why it was juried. The definition opposing counsel points to of juried being on a website of Texas A&M University, Kingsville, even taking that website at face value, which it was never presented to the district court. It was not able to be contextualized, but even on that understanding, it simply acknowledges that yes, there are certain types of works that may constitute juried creative activities. Here are some examples, but again, he never showed the district court. Here's what I did within those examples and here's why they are juried creative activities instead of simply mere creative activities. Opposing counsel also stated that TAMUK failed to follow its policy and that is why race discrimination may be inferred. The policy was laid out in unrebutted testimony from president Hussey at pages 259 and 60 of the record, where he described, this is the tenure review process as the former president. I know exactly what it was and here it is. There's no dispute over what that process was. There's also no point that opposing counsel can point to in the record that shows that that policy was not followed, that that process was not followed. There was not a summary judgment, your honor. They did not rely on any of that. In fact, all of that documentation was produced as part of discovery in the Then they had the full opportunity to take multiple depositions of many individuals about those issues. And when it came time for summary judgment and we said, there's no evidence, their response was, well, but the experts said I shouldn't have to do multiple juried works. And here is his personal declaration. And then here is Barraza, who says there were a couple other people, but then no evidence to show how those people were situated. Um, so full discovery was, was available, uh, to Ibanez on this issue, but the record, um, was developed not to show similarly situated. And certainly he had the opportunity to see all the paperwork of who made tenure and who didn't. Your honor, therefore, for either of these alternative reasons, the reason that he failed to identify what second work fit the definition of juried, or the reason that he failed to show what specific person was motivated by his race and what evidence that is based off of for either of those reasons, certainly for both of them, this court should affirm the judgment below. All right. Thank you, sir. Thank you. All right. Ms. Gilson, you have rebuttal. Please the court. Um, the summary judgment stage, this is a review, um, of the evidence. And the fact is, is that there were more than one applying the, the plain meaning of juried, there was more than one juried, um, activity that Father Ibanez presented to the trial court. Also in regard to the evidence regarding the, uh, discrimination, there was some very substantial evidence from the, that was presented to the president and provost, um, Reinesh regarding the fact that there were not a significant amount of Hispanic professors and that they had been overlooked, um, for promotion within the university. This Texas A&M is located, uh, Kingsville is located in Kingsville, Texas. It is a Hispanic serving institution. And, um, provost Reinesh agreed with the Hispanic faculty concerns that there are qualified Hispanic candidates for faculty administrative positions who are often overlooked. And in, um, in the brief, there are statistics that only 9.9% of 437, um, faculty members are Hispanic. So along with the other evidence that we have, I think that is very strong evidence, especially this being a Hispanic serving university. The- Was counsel opposite correct that throughout the appeals process within A&M, his argument was that as a film professor, he shouldn't have to meet the two juried process, whereas that's become the argument now that it's in court. So the question is, can you point to anything in the summary judgment record where he was arguing, I do have two juried, as opposed to that's not consistent with the type of creative stuff I do? I do not, I'm not aware of any evidence specifically where Mr. Abana says this was juried. However, he presented his record, um, his academic record for consideration. And- And is there evidence that he was arguing, I shouldn't be subject to jury requirements. It doesn't work with films. I'm not aware of that. What I'm aware of is that, um, that there are different standards and that the people reviewing him did not hold the background to judge him. And when we look at the Tannick case, uh, Fifth Circuit case, one of the- What in this case, counsel opposite says, gives an iteration of the defendants of the school who were deposed. What in any of the depositions would we look to, you know, supporting the argument of their, you know, animus against your client? The, the animus against the client is that the lower level of the appeal, they found, um, that there was either not based on his academic record, they didn't give it full consideration, that the decision was made illegally, or that it was, um, retaliation or against his academic freedom. We don't know what it is, but that panel determined that there was an issue. And that was- That wasn't my question. I'm saying, I understood that in addition to your client's deposition, the depositions of the school officials were taken, and I'm only asking you, what within any of those depositions is ammunition, if you will, for you to point out to us to say, this should be on the scale from their own words of the animus. That's, that's what I'm asking. The depositions were not in the record, um, as far as for the summary judgment, but the comment by the provost regarding the lack of Hispanic faculty members, um, it is in the record, and that there was a, um, admission that the faculty administrative positions are often overlooked for Hispanics. I mean, okay. I mean, we get the point of underrepresentation. I certainly do. But as you well know, in a case, you got to go beyond that in order to establish that, that at least there's a tribal fact that in this instance, one of these persons or whatever, you know, did, and that's all I was asking, but I heard your answer, I guess if they were favorable to him, they would be in the record, but they're not in the record, but he said they were taken, and that's why I asked, and that's why I asked you up. I said, what does the summary judgment record consist of? And you told me, and you said you think it's affidavit and that's sufficient. So that answers my, if I had a qualm about whether there should be, it should go back because the record is incomplete. That's what I was trying to get to, but I haven't heard you say that there's anything that's not in the summary judgment record, it's just a matter of how one comes out the end of the tunnel on what's in there, is that correct? Yes, Your Honor. If it were me preparing a summary judgment response, I might have done it differently, but I wasn't the trial counsel, but I still believe that there's sufficient evidence to find discrimination. All right. Well, we appreciate your argument in briefing and with both counsel responding to the questions of the panel, it's an interesting case. The case will be submitted before we take up the fourth.